## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| RICHARD BEBBER, COLIN CUSTARD, and SHERRY BRACY, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>CNET MEDIA, INC.,<br><br>        Defendant. | Civil Action No.2:21-CV-11824-SFC-APP<br><br>HON. SEAN F. COX<br><br>**DEFENDANT CNET MEDIA, INC.'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**<br><br> **[Oral Argument Requested]**<br><br>Complaint Filed:   August 6, 2021<br>Complaint Served:  October 19, 2021 |

## DEFENDANT CNET MEDIA, INC.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

Defendant CNET MEDIA, INC. ("CNET") respectfully requests that this Court dismiss Plaintiffs Richard Bebber's, Colin Custard's, and Sherry Bracy's (collectively "Plaintiffs") First Amended Class Action Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(1) and/or Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs have failed (1) to adequately allege injury-in-fact for Article III standing purposes and (2) to state a claim upon which the Court can grant relief ("Motion"). The brief submitted with this Motion explains the legal basis for the motion.

Pursuant to L.R. 7-1, counsel for CNET and counsel for Plaintiffs have met and conferred on several occasions, both over the phone and via email, since Plaintiff

Richard Bebber filed the original Complaint.  During those meet-and-confers, counsel discussed the subject matter of this Motion and the relief requested herein. No concurrence could be obtained.

DATED: May 16, 2022

**BAKER & HOSTETLER LLP**

By: *s/ Matthew D. Pearson*
    Casie D. Collignon
    Matthew D. Pearson

BAKER HOSTETLER LLP
600 Anton Blvd., Suite 900
Costa Mesa, CA  92626
Tel.: (714) 754-6600
Facs.: (714) 754-6611
Email:mpearson@bakerlaw.com
SBN 294302

Attorneys for Defendant
CNET MEDIA, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2022, I electronically filed the foregoing

**DEFENDANT CNET MEDIA, INC.'S MOTION TO DISMISS**

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT** using

the CM/ECF system, which will send notification of such filing to all counsel of

record.

                                    */s/ Matthew D. Pearson*
4894-7757-8527.3

3

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| RICHARD BEBBER, COLIN CUSTARD, and SHERRY BRACY, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CNET MEDIA, INC., <br><br> Defendant. | Civil Action No.2:21-CV-11824-SFC-APP <br><br> HON. SEAN F. COX <br><br> **BRIEF IN SUPPORT OF DEFENDANT CNET MEDIA, INC.'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **[Oral Argument Requested]** <br><br> Complaint Filed:   August 6, 2021 <br> Complaint Served: October 19, 2021 |

## BRIEF IN SUPPORT OF DEFENDANT CNET MEDIA, INC.'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

Defendant CNET MEDIA, INC. ("CNET") respectfully submits this Brief in Support of its Motion to Dismiss Plaintiffs Richard Bebber's ("Bebber"), Colin Custard's ("Custard"), and Sherry Bracy's ("Bracy" and together with Bebber and Custard, "Plaintiffs") First Amended Class Action Complaint, [Dkt. No. 20] ("Motion").

# **TABLE OF CONTENTS**

CONCISE STATEMENT OF ISSUES PRESENTED ...............................................1

CONTROLLING OR MOST APPROPRIATE AUTHORITY ...............................1

I.      INTRODUCTION ....................................................................................2

II.     STATEMENT OF FACTS........................................................................4

        A.      CNET Magazine.............................................................................4

        B.      Plaintiffs' Allegations ...................................................................5

        C.      CNET's Investigation into Plaintiffs' Claims..................................8

III.    MOTION TO DISMISS STANDARD .......................................................9

        A.      Federal Rule of Civil Procedure 12(b)(1) .........................................9

        B.      Federal Rule of Civil Procedure 12(b)(6) .......................................10

IV.     ARGUMENT...........................................................................................11

        A.      Plaintiffs Have Failed to Establish That This Court Has Subject-
                Matter Jurisdiction Over Their Claims. .........................................11

                1.      CNET Could Not Have Disclosed Plaintiffs' Personal
                        Reading Information Because CNET Never Possessed
                        Plaintiffs' Personal Reading Information. .........................13

        B.      Plaintiffs Have Failed to Allege a Plausible Claim Against
                CNET. ...........................................................................................18

V.      CONCLUSION .......................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................1, 10, 11

*Balistreri v. Pacifica Police Dep't.,*
  901 F. 2d 696 (9th Cir. 1990) ............................................................10

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................1, 10, 11

*Bishop v. Lucent Techs., Inc.,*
  520 F.3d 516 (6th Cir. 2008) .............................................................11

*Boelter v. Hearst Commc'ns, Inc.,*
  192 F. Supp. 3d 427 (S.D.N.Y. 2016) ............................................14, 15

*Bridges v. Senger,*
  730 F. Supp. 1401 (W.D. Mich. 1990) ...............................................23

*Buchholz v. Meyer Njus Tanick, PA,*
  946 F.3d 855 (6th Cir. 2020) .........................................................11, 13

*Cain v. Redbox Automated Retail, LLC,*
  981 F. Supp. 2d 674 (E.D. Mich. 2013) ..............................................10

*Chevalier v. Est. of Barnhart,*
  803 F.3d 789 (6th Cir. 2015) .............................................................11

*Coulter-Owens v. Time, Inc.,*
  308 F.R.D. 524 (E.D. Mich. 2015) .....................................................12

*Coulter-Owens v. Time Inc.,*
  695 F. App'x 117 (6th Cir. 2017).............................................12, 13, 17

*Coulter-Owens v. Time, Inc.,*
  No. 12-CV-14390, 2016 WL 612690 (E.D. Mich. Feb. 16, 2016),
  *aff'd*, 695 F. App'x 117 (6th Cir. 2017)...............................................13

*Madison-Hughes v. Shalala,*
    80 F.3d 1121 (6th Cir. 1996) ...................................................................9

*Mitchell v. City of Detroit,*
    114 F.3d 1188 (6th Cir. 1997) ...............................................................19

*Ohio Nat. Life Ins. Co. v. United States,*
    922 F.2d 320 (6th Cir. 1990) ............................................................9, 10

*Peterson v. City of Grand Rapids,*
    182 F. Supp. 3d 750 (W.D. Mich. 2016) ................................................9

*United States v. Ritchie,*
    15 F.3d 592 (6th Cir. 1994) ....................................................................9

*Ward v. Alternative Health Delivery Sys., Inc.,*
    261 F.3d 624 (6th Cir. 2001) ................................................................11

*Wheaton v. Apple Inc.,*
    No. C 19-02883 WHA, 2019 WL 5536214 (N.D. Cal. Oct. 25,
    2019) ........................................................................................1, 23, 24

## Statutes

Mich. Comp. Laws Ann. § 445.1712....................................................22

Mich. Comp. Laws Ann. § 445.1712(1) ...............................................13

Mich. Comp. Laws Ann. § 445.1713(a) ...............................................13

Mich. Comp. Laws Ann. § 445.1715(a) ...............................................12

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

1.  Whether Plaintiffs' First Amended Class Action Complaint ("Amended Complaint") should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because Plaintiffs cannot meet their burden of establishing that they have suffered an injury-in-fact for Article III standing purposes.

2.  Whether Plaintiffs' Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs have not sufficiently alleged a plausible cause of action for a violation of Michigan's Preservation of Personal Privacy Act, Mich. Comp. Law 445.1711, *et seq*.

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

Authority:   *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)); *Wheaton v. Apple Inc.,* No. C 19-02883 WHA, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019).

## I.  <u>INTRODUCTION</u>

Plaintiffs' Amended Complaint alleges that CNET violated Michigan's Preservation of Personal Privacy Act, Mich. Comp. Law 445.1711, *et seq.* ("PPPA") by collecting and then disclosing to third parties their full names, titles of publications subscribed to, and home addresses, which Plaintiffs define collectively as "Private Reading Information." But, as CNET has repeatedly told Plaintiffs since this lawsuit was filed, no Plaintiff ever directly subscribed to CNET magazine and, therefore, CNET did not collect, did not possess, and, in turn, could not have disclosed their Private Reading Information. In fact, the Plaintiffs do not appear in any of CNET's records at all.

From late 2014 to 2019, CNET published CNET Magazine.  During that time, people could subscribe to CNET Magazine directly through CNET by providing CNET with their name, address, payment information, etc. People could also subscribe to CNET Magazine through third-party resellers by providing those third-party resellers with their name, address, payment information, etc. The information collected by the third-party resellers in connection with the purchase of a CNET Magazine subscription remained with the third-party resellers; it was never provided to CNET.   Therefore, if a person purchased a subscription to CNET Magazine but is not located in CNET's subscriptions record, that person must have purchased the subscription from a third-party reseller.

Plaintiffs refuse to accept this truth. They allege that, prior to July 30, 2016, they purchased subscriptions to CNET Magazine directly from CNET. These allegations are patently false. CNET has a record of every person who purchased directly from CNET a CNET Magazine subscription from the magazine's inception through its final publication date, and it has no record of any Plaintiff. Plaintiffs allege that, prior to July 30, 2016, CNET disclosed their Private Reading Information to various third-party entities without Plaintiffs' consent. This is not only false but also impossible. Prior to the Complaint being filed, CNET had no idea who Plaintiffs were, had no record of Plaintiffs ever being subscribers, and, as such, could not have disclosed information it never possessed in the first place. Finally, Plaintiffs allege that CNET owes to each of them, and to every member of the putative class, at least $5,000 in PPPA statutory damages. But how CNET owes Plaintiffs any money under the PPPA or how the PPPA even applies to CNET under the facts of this case remains unclear.

In sum, and as CNET has explained to Plaintiffs through countless lengthy meet and confers, CNET could not have violated Plaintiffs' PPPA rights because CNET never had Plaintiffs' Private Reading Information to disclose. Absent this ability, Plaintiffs have failed to establish that they suffered an injury-in-fact sufficient to establish that they have standing to sue CNET in this lawsuit. Moreover, even if the Court assumes that standing exists, Plaintiffs have still not

3

adequately alleged a viable claim under the PPPA.  Therefore, CNET requests that the Court grant this Motion and dismiss, with prejudice, Plaintiffs' Amended Complaint.

## II.   <u>STATEMENT OF FACTS</u>

### A.   <u>CNET Magazine</u>

In November 2014, CNET began publishing its quarterly magazine, CNET Magazine. [Declaration of Danielle Ramirez ("Ramirez Decl."), ¶ 2.] CNET offered for sale CNET Magazine through two different avenues. [*Id.* at ¶ 3.] Customers could purchase subscriptions to CNET Magazine directly from CNET, or they could purchase subscriptions to CNET Magazine through third-party resellers. [*Id.*] Customers who purchased subscriptions directly from CNET provided their personal information, including, but not limited to, their name, address, etc., directly to CNET. [*Id.* at ¶ 4.] The personal information of customers who purchased CNET Magazine subscriptions from third-party resellers were not provided to CNET. [*Id.* at ¶ 5.]

For any customer who purchased CNET Magazine subscriptions directly from CNET, CNET saved their information, including, but not limited to, name, address, subscription plan, payment information, etc., in the Recurly database. [Declaration of Keric Donnelly ("Donnelly Decl."), ¶ 2.] If a customer purchased a CNET Magazine subscription directly from CNET, the customer had to be included in the

4

Recurly database because, if the customer was not, CNET would not have been able to bill him or her for his or her subscription. [*Id.* at ¶ 3.] The Recurly database included the information of all customers who purchased CNET magazine subscriptions directly from CNET from the date of CNET Magazine's inaugural issue (November 2014) to the date on which CNET stopped publishing CNET magazine (2019). [Donnelly Decl., ¶ 3; Ramirez Decl., ¶ 6.] The Recurly database does not include any personal information on individuals who purchased a subscription solely from any third-party reseller. [Donnelly Decl., ¶ 4.]

## B.    **Plaintiffs' Allegations**

On August 6, 2022, Bebber filed against CNET a putative class action in the United States District Court for the Eastern District of Michigan, asserting a single cause of action for violation of the PPPA. [Dkt. No. 1.] Bebber alleged (1) that he "was a subscriber to CNET magazine, including during the relevant pre-July 30, 2016 time period," [*id.* at ¶ 9], (2) that he "purchased his subscription to CNET Magazine directly from CNET," [*id.*], and (3) that "[s]ince [he] subscrib[ed] to CNET, and during the relevant pre-July 30, 2016 time period, CNET disclosed, without the requisite consent or prior notice" and in violation of the PPPA, "Plaintiff's Private Reading Information to data aggregators, data appenders, and/or data cooperatives" and "rented or exchanged mailing lists containing Plaintiff's Private Reading Information to third parties seeking to contact CNET subscribers,

without first obtaining the requisite written consent from Plaintiff," [*id.* at ¶ 9].

Bebber did not identify by name or otherwise any of these alleged "data aggregators, data appenders, and/or data cooperatives" to which CNET allegedly sold his Private Reading Information. [*See generally id*.] Indeed, the only third party that Bebber loosely identified in a single sentence in the Complaint that allegedly could provide access to his Private Reading Information is "a list broker, NextMark, Inc. ('NextMark')." [*Id.* at ¶ 2.] To support this claim, Bebber included in the Complaint, and attached as Exhibit A, a screenshot of what he represents is a page on NextMark's website that he claims purports to "offer[] to provide renters access to the mailing list titled 'CNET Magazine Subscribers Mailing List', which contains the Private Reading Information of 455,840 of CNET's active U.S. subscribers at a base price of '$90.00/M [per thousand],' (i.e., 9 cents apiece)." [*Id.* at ¶ 2, Exhibit A.]

Conspicuously, Bebber did not include in the Complaint (or attach to it) a screenshot of the entire page on NextMark's website. [*See id.* at ¶ 2, Exhibit A.] Instead, the bottom is cut off, and the screenshot is cropped in a way that excludes the website address, thereby preventing CNET from verifying on its own whether the page still exists or has ever existed. [*See id.* at ¶ 2, Exhibit A.]

Furthermore, Bebber alleges that NextMark offers to provide a list of "the Private Reading Information of 455,840 of CNET's *active* U.S. subscribers," [*id.* at

¶ 2 (emphasis added)], yet nowhere in the Complaint does Bebber claim to be an "active" subscriber, [*see generally id*], nor could he as CNET ceased publishing CNET Magazine in 2019, [Ramirez Decl., ¶ 6]. If anything, Bebber's own allegations suggest that he is *not* an active subscriber. [*See* Dkt. No. 1, ¶ 9 ("Plaintiff *was* a subscriber to CNET magazine, including during the relevant pre-July 30, 2016 time period." (emphasis added).]

On April 1, 2022, Bebber filed the Amended Complaint, naming two new Plaintiffs: Colin Custard ("Custard") and Sherry Bracy ("Bracy"). Aside from the addition of these two Plaintiffs, however, the Amended Complaint is identical to the Complaint. [*Compare* Dkt. No. 1 *with* Dkt. No. 20.] Indeed, the only difference between the two complaints is that the Amended Complaint includes three additional paragraphs, each describing the residency of a different named Plaintiff. [*See* Dkt. No. ¶¶ 9 (Bebber's residency), 10 (Custard's residency), 11 (Bracy's residency).]

The allegations in the Amended Complaint regarding NextMark are entirely unchanged from the initial Complaint. The Amended Complaint still includes and attaches an incomplete screenshot from NextMark's website. [*See* Dkt. No. 20, ¶ 2, Exhibit A.] It still alleges that NextMark merely offers to provide access to, not that it possesses, the CNET Magazine Subscribers Mailing List. [*Id.* at ¶ 2.] It still alleges that the CNET Magazine Subscribers Mailing List includes "the Private Reading Information of 455,840 of CNET's *active* U.S. subscribers," [*id.* at ¶ 2

(emphasis added)], but, again, fails to allege that either Bebber, Custard, or Bracy are *active* subscribers, [*see id.* at ¶ 12 ("Plaintiffs *were subscribed* to CNET magazine, including during the relevant pre-July 30, 2016 time period." (emphasis added)). And it still remains devoid of any *facts* that, even read in the most favorable light to Plaintiffs, would suggest, let alone establish, that (1) if NextMark could gain access to a CNET subscriber list, the source of that list was CNET, (2) if NextMark was the source of that list, the list included *Plaintiffs'* Private Reading Information and (3) that, even if NextMark did possess *Plaintiffs'* Private Reading Information, it did so prior to July 30, 2016—the last date on which Plaintiffs have an actionable claim under the PPPA. [*See id.* at ¶ 52 (limiting the putative class to "all Michigan residents who, *at any point during the relevant pre-July 30, 2016 time period*, had their Private Reading Information disclosed to third parties by CNET without consent" (emphasis added).]

## C.    **CNET's Investigation into Plaintiffs' Claims**

After Bebber filed his Complaint, CNET searched its Recurly database for Bebber, both by his name and his addresses. [Donnelly Decl., ¶ 5-8.] Neither Bebber's name nor his addresses appeared in the Recurly database. [*Id.* at ¶ 8.]

As a result of meet and confers with Plaintiffs' counsel prior to the filing of the Amended Complaint, CNET searched the Recurly database for Custard and Bracy, both by their names and their addresses. [*Id.* at ¶ 5-8.] Neither the names nor

the addresses of either Custard or Bracy appeared in the Recurly database. [*Id.* at ¶ 8.]

CNET is not aware of any other database in CNET's possession, custody, or control that would contain any information indicating that any individual, including Bebber, Custard, or Bracy, subscribed to CNET Magazine. [*Id.* at ¶ 9.]

## III.   **MOTION TO DISMISS STANDARD**

### A.   **Federal Rule of Civil Procedure 12(b)(1)**

"When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996); *see also Peterson v. City of Grand Rapids*, 182 F. Supp. 3d 750, 753 (W.D. Mich. 2016) ("[T]he plaintiff will have the burden of proof that jurisdiction does in fact exist." (internal quotations omitted)). Such challenges "fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). "A facial attack on the subject matter jurisdiction alleged by the complaint merely questions the sufficiency of the pleading," and, "[i]n reviewing such a facial attack, a trial court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss." *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). In contrast, "when a court reviews a complaint under a factual attack," as the Court is tasked with doing here, "no

9

presumptive truthfulness applies to the factual allegations." *Id.* Instead, the court must "weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist" and "has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdiction facts." *Id* ; *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 680 (E.D. Mich. 2013) ("No presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.").

### B.     Federal Rule of Civil Procedure 12(b)(6)

A complaint is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6) if there are insufficient facts alleged under a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't.*, 901 F. 2d 696, 699 (9th Cir. 1990). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal* ("*Iqbal*"), 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 556 (2007)). "Facial plausibility" requires factual allegations "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556 (2007)). Although a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above

the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also Bishop v. Lucent Techs., Inc.,* 520 F.3d 516, 519 (6th Cir. 2008) ("Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.").

IV.  **ARGUMENT**

A.  **Plaintiffs Have Failed to Establish That This Court Has Subject-Matter Jurisdiction Over Their Claims.**

In this case, several facts are undisputed. **First**, because Plaintiffs filed their lawsuit in federal court, they must establish that this Court has subject-matter jurisdiction over their claims. *See Chevalier v. Est. of Barnhart*, 803 F.3d 789, 794 (6th Cir. 2015) ("The plaintiff has the burden of proving that the federal court has subject-matter jurisdiction.").

**Second**, in order to establish subject-matter jurisdiction, Plaintiffs must allege that they suffered an injury-in-fact as a result of CNET's allegedly unlawful conduct—here, the alleged disclosure, without Plaintiffs' consent and prior to July 30, 2016, of Plaintiffs' Personal Reading Information. *See Ward v. Alternative Health Delivery Sys., Inc.,* 261 F.3d 624, 626 (6th Cir. 2001) ("[A] plaintiff's lack of standing is said to deprive a court of jurisdiction."); *see also Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020) ("The plaintiff carries the burden of

11

establishing th[e] three elements" of standing, including that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision" (internal quotations omitted)).

**Third**, Plaintiffs here can only establish injury-in-fact one of two ways: (1) actual damages arising from CNET's alleged, unconsented-to disclosure of Plaintiffs' Personal Reading Information or (2) a bare violation of the PPPA. *See Coulter-Owens v. Time Inc.,* 695 F. App'x 117, 121 (6th Cir. 2017) (holding that a violation of the PPPA, alone, is "a cognizable injury in fact for purposes of Article III standing"); *see also Coulter-Owens v. Time, Inc*., 308 F.R.D. 524, 534 (E.D. Mich. 2015) ("The [PPPA] provides for '[a]ctual damages, including damages for emotional distress, or $5,000.00, whichever is greater.'" (quoting Mich. Comp. Laws § 445.1715(a)).

**And fourth**, Plaintiffs do not allege that they suffered, nor do they seek, actual damages. [Dkt. No. 20, ¶ 76 (alleging that, "[a]s a result of CNET's unlawful disclosure of their Private Reading Information, Plaintiffs and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA)" and seeking "$5,000.00 per Class member pursuant to PPPA § 5(a)").

Read together, these four undisputed facts lead to one, inevitable conclusion: in order to establish, at the pleading phase, that this Court has subject-matter

jurisdiction, Plaintiffs must "clearly allege facts demonstrating" that CNET disclosed, without their consent and prior to July 30, 2016, their Personal Reading Information. *See Buchholz*, 946 F.3d at 861. As discussed below, Plaintiffs have failed to do this and will never be able to do this. Their Amended Complaint must be dismissed.

      1.    CNET Could Not Have Disclosed Plaintiffs' Personal Reading Information Because CNET Never Possessed Plaintiffs' Personal Reading Information.

The PPPA makes it unlawful, absent the "written permission of the customer," Mich. Comp. Laws Ann. § 445.1713(a), for "a person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials…[to] knowingly disclose to any person, other than the customer, a record or information that personally identifies the customer as having purchased, leased, rented, or borrowed those materials from the person engaged in the business," Mich. Comp. Laws Ann. § 445.1712(1).

The PPPA has, over time, been limited through judicial interpretation. For example, in *Coulter-Owens*, the Sixth Circuit interpreted the phrase "at retail" as used in the PPPA and found that while the PPPA may apply if the defendant both sold the magazine to the plaintiff and disclosed her information thereafter, it did not apply if the defendant disclosed the information but did not sell directly to the

13

plaintiff. *Coulter-Owens*, 695 F. App'x at 124; *see also Coulter-Owens v. Time, Inc.*, No. 12-CV-14390, 2016 WL 612690, at *3 (E.D. Mich. Feb. 16, 2016), *aff'd*, 695 F. App'x 117 (6th Cir. 2017) ("[U]nder the ordinary and plain reading of the term 'at retail,' magazine subscription purchases from a third-party, such as the purchases involved in this case, are not encompassed by the statute."); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 452–53 (S.D.N.Y. 2016) ("[The] direct relationship between consumer and seller is what qualifies an individual as a retailer for purposes of the statute.").

Here, Plaintiffs allege: (1) that "[w]hile residing in, a [sic] citizens of, and present in Michigan, Plaintiffs purchased their subscriptions to CNET magazine directly from CNET," [Dkt. No. 20, ¶ 12]; and (2) that "[s]ince subscribing to CNET, and during the relevant pre-July 30, 2016 time period, CNET disclosed, without the requisite consent or prior notice, Plaintiffs' Private Reading Information" to various third parties, [*id.* at ¶ 12]. Put another way, Plaintiffs allege that they purchased directly from CNET (i.e., paid money directly to CNET, not some third-party reseller) a subscription to CNET Magazine and that at some point between when they purchased their subscriptions and July 30, 2016 (i.e., the date the amended PPPA requiring actual damages took effect), CNET disclosed their Personal Reading Information without their consent.

Notably absent from Plaintiffs' Complaint, however, are any alleged *facts*

14

relating to their transaction with CNET. Despite claiming that they purchased a subscription to CNET magazine prior to July 30, 2016 (an allegation necessary to avoid the application of the amended PPPA and its actual-damage requirement) [Dkt. No. 20, ¶ 12], Plaintiffs do not provide the date on which they purchased the subscription, [*see generally id.*]. They do not even allege an approximate month or year. Additionally, despite alleging that they purchased their subscription directly from CNET (an allegation necessary to trigger application of the PPPA) [*id.* at ¶ 12], they do not allege how they purchased the subscription (i.e., through the mail, over the phone, or online with a credit card, a check, or a cash payment), [*see generally id.*].

CNET highlights these deficiencies because the presumed reason for their absence directly supports *why* Plaintiffs lack standing here: ***CNET has no record of any of the three Plaintiffs ever purchasing a subscription to CNET Magazine.***

After Bebber filed the initial complaint in this action, CNET ran searches of its Recurly database, which contains all of CNET Magazine's subscription and subscriber payment information, for anyone by the name of Richard Bebber who was associated with a Michigan address. [Donnelly Decl., ¶ 8.] That search returned no results. [*Id.*] CNET then expanded its search for anyone by the name of Richard Bebber residing anywhere in the United States. [*Id.*] Still no results. [*Id.*] CNET then obtained from Bebber's counsel two addresses for Bebber. CNET searched for those

addresses in its Recurly database. [*Id.*] No results. [*Id.*] Put simply, either Bebber never purchased a subscription to CNET Magazine or, if he did, he did so through a third-party reseller of CNET Magazine. [*Id.* at ¶ 2 (declaring that if a customer purchased a CNET subscription from CNET directly, his information would be included in the Recurly database).]  Either way, the PPPA does not apply, and Bebber lacks standing to bring his claims.

The same is true for Custard and Bracy. CNET searched its Recurly database for anyone by the name of either Colin Custard or Sherry Bracy. [Donnelly Decl., ¶ 8.] That searched returned no results. [*Id.*] CNET ran searches for the addresses provided to CNET for Custard and Bracy. [*Id.*] No results. [*Id.*] Thus, like Bebber, Custard and Bracy either never purchased a subscription to CNET Magazine or, if they did, they did so through a third-party reseller of CNET Magazine. [*Id.* at ¶ 2.] Regardless, the PPPA does not apply, and both Custard and Bracy lack standing to bring their claims.

Plaintiffs may argue that, for purposes of a motion to dismiss, their allegations that they purchased a subscription directly from CNET and that CNET disclosed their Personal Information without their consent are sufficient. They may claim that the Recurly database is incomplete and that there are myriad reasons why they may

16

have been omitted from the database despite being CNET Magazine subscribers.[1] They may even seek leave from the Court to take limited discovery on CNET so that they, themselves, can confirm whether they are in the Recurly database and whether the database is complete.

This, however, is not a case in which the Plaintiffs are ignorant of the facts necessary to give rise to standing. Plaintiffs, themselves, know *if* they purchased a CNET Magazine subscription and, if they did, *when, how*, and *from whom* they purchased it. No amount of discovery changes that. Similarly, Plaintiffs, themselves, are in possession of the evidence necessary to substantiate their claims, evidence that could be presented in myriad forms (e.g., a copy of a cashed check, a bank statement, a receipt, etc.). Indeed, in today's online world, it is hard to fathom a magazine-subscription purchase that was not accompanied by some easily retrievable documentation (e.g., an email confirmation, a credit-card transaction, etc.). *See Coulter-Owens*, 308 F.R.D. at 531–32 (noting, in a PPPA case where the defendant claimed ascertaining the class was impossible, that "in many instances, e-mail confirmations of Internet purchases are sent to the purchaser" and that "[t]hese email confirmations may serve as evidence to establish that a particular customer falls

---

[1] Of course, it goes without saying that *even if* all three plaintiffs were inadvertently omitted from the Recurly database, which, in and of itself, strains credulity, CNET could not have disclosed Plaintiffs' Personal Reading Information—the crux of Plaintiffs' claims—if it was not in possession of their Personal Reading Information.

17

within the proposed [PPPA] class definition"). Yet nowhere in the Amended Complaint do Plaintiffs even attempt to substantiate their claims that they purchased a CNET Magazine subscription from CNET. [*See generally* Dkt. No. 20.] They could not even allege when or how they purchased it.

At bottom, CNET has, thus far, done everything in its power to substantiate Plaintiffs' claims that they purchased, prior to July 30, 2016, a CNET Magazine subscription directly from CNET. It searched its Recurly database, which, again, contains all of CNET Magazine's subscription and subscriber payment information, and found absolutely no record of any of the Plaintiffs. [Donnelly Decl., ¶¶ 2-4, 7-9.] There is nothing more CNET can do. It is now Plaintiffs' turn to do something—other than baldly allege in one paragraph of a 76-paragraph complaint—to prove that they even fall within the class of individuals the PPPA is meant to protect. Unless and until they do that, this Court lacks subject-matter jurisdiction over their claims and, therefore, must dismiss them. CNET respectfully requests that the Court dismiss Plaintiffs' claims for lack of subject-matter jurisdiction.

### B.    Plaintiffs Have Failed to Allege a Plausible Claim Against CNET.

Plaintiffs' Amended Complaint is riddled with bald assertions, unadorned and unsupported by facts, that CNET violated, prior to July 30, 2016, Plaintiffs' and the putative class members' rights under the PPPA. [*See, e.g.,* Dkt. No. 20, ¶¶ 1, 3, 5, 12, 44-45, 64-66,  75.] These conclusory assertions are insufficient to state a viable

claim. *Mitchell v. City of Detroit*, 114 F.3d 1188 (6th Cir. 1997) (affirming dismissal because the complaint's "conclusory allegations that [plaintiff's] rights were violated…are not sufficient to state a claim").

Given the frequency with which Plaintiffs assert that CNET disclosed their Private Reading Information and the staggering number of entities to which Plaintiffs assert CNET disclosed it, including "data aggregators," [Dkt. No. 20, ¶¶ 1, 5, 12, 33, 36, 44-45, 64, 74], "data appenders," [*id.* at ¶¶ 1, 5, 12, 36, 44-45, 64, 74], "data cooperatives," [*id.* at ¶¶ 1, 5, 12, 33, 36, 46, 65], "consumer-facing businesses," [*id.* at ¶ 45], "non-profit organizations," [*id.* at ¶ 45], "political organizations," [*id.*], "aggressive advertisers," [*id.* at ¶ 1], and, indeed, "anybody willing to pay for it," [*id.* at ¶ 50], one would assume that Plaintiffs identified in the Amended Complaint at least one entity to which CNET disclosed *their* Private Reading Information *prior to July 30, 2016*. Tellingly, they do not.

The only third-party entity identified in Plaintiffs' Amended Complaint is NextMark. [*See id.* at ¶ 2.] NextMark, Plaintiffs claim, is "a list broker," a type of entity largely missing from the laundry list of entities to which Plaintiffs claim CNET disclosed Private Reading Information, that "offers to provide renters access to the mailing list titled 'CNET Magazine Subscribers Mailing List', which," according to Plaintiffs, "contains the Private Reading Information of 455,840 of CNET's active U.S. subscribers at a base price of '$90.00/M [per thousand],' (i.e.,

9 cents apiece)…" [*id.*] To support their claim, Plaintiffs include in the Amended

Complaint and attach to it as an exhibit the following screenshot:



The accuracy and veracity of this screenshot is, at best, questionable. First,

Plaintiffs cropped it in such a way to (1) not include all information from the page

(the bottom has been cut off) and (2) not include the website address (so as to

preclude CNET from independently verifying its existence). [*Id.* at ¶ 2.] Indeed,

neither Googling for the page nor searching NextMark's website for it produced any

results. And second, the screenshot claims to have "counts through 04/05/2021." [*Id.*

at ¶ 2.] This, too, raises suspicion, given that Nextmark purports to have access to

*current* subscriber information nearly *two years after* publication of the magazine ceased.

But even ignoring the fact that the NextMark screenshot is far from reliable, the screenshot itself makes clear why Plaintiffs here have failed to state a claim. First, nowhere in the screenshot does NextMark indicate from whom it can allegedly obtain the "CNET Magazine Subscribers Mailing List." [*See generally id*. at ¶ 2, Exhibit A.] And, given that CNET was not the only entity selling CNET Magazine subscriptions, it is just as likely, if not more likely, that if NextMark truly can obtain the CNET Magazine Subscribers Mailing List, it is because some reseller is willing to broker its own list to Nextmark.

Second, nowhere in the screenshots does NextMark indicate that it *has* CNET Subscriber information. Indeed, in Plaintiffs' own words, NextMark is "a list broker," which is presumably representing that it *can* provide "renters access to the mailing list titled 'CNET Magazine Subscribers Mailing List'", not that it currently *possesses* any such list. [*Id.* at ¶ 2, Exhibit A.]

Third, nowhere in the screenshots does NextMark indicate when it got access to the CNET Magazine Subscribers Mailing List. [*See generally id*. at ¶ 2, Exhibit A.] Indeed, based on NextMark's representation that it possesses CNET Magazine subscription "counts through 04/05/2021," the screenshot suggests that *if* NextMark did, in fact, come into possession of the CNET Magazine Subscribers Mailing List,

21

it did so *after* July 30, 2016, thereby falling outside the time period at issue here and after the amended PPPA's actual-damages requirement took effect.

Fourth, even if the Court assumes that CNET did provide NextMark with the CNET Magazine Subscribers Mailing List and did so prior to July 30, 2016, there is nothing in the screenshot to indicate that the CNET Magazine Subscribers Mailing List includes subscriber information sufficient to trigger the application of the PPPA. [*See generally id*. at ¶ 2, Exhibit A.] The PPPA makes clear that a person, such as CNET, "shall not knowingly disclose to any person, other than the customer, a record or information that *personally identifies the customer as having purchased, leased, rented, or borrowed those materials from the person engaged in the business*." Mich. Comp. Laws Ann. § 445.1712 (emphasis added). At best, the screenshot suggests that the CNET Magazine Subscribers Mailing List includes: age, gender, address, income, and state or zip code. [*See* Dkt. No. 20, ¶ 2, Exhibit A.] Never once does the screenshot say that the CNET Magazine Subscribers Mailing List includes any person's name. [*See generally id*.] And without a name, it cannot be said that the CNET Magazine Subscribers Mailing List "personally identifies the customer as having purchased, leased, rented, or borrowed" reading materials because the fact that someone located at a certain address purchased CNET Magazine does not indicate who that someone is (whether father, son, mother, daughter, cousin, or roommate).

And, finally, even if the Court assumes (1) that CNET provided NextMark with the CNET Magazine Subscribers Mailing List, (2) that it did so prior to July 30, 2016, and (3) that the CNET Magazine Subscribers Mailing List "personally identified" individuals as having purchased CNET Magazine, the screenshot still says nothing about whether the CNET Magazine Subscribers Mailing List personally identified *Plaintiffs* as having purchased CNET Magazine. In fact, it suggests the opposite. Plaintiffs, themselves, describe the CNET Magazine Subscribers Mailing List as a list "of CNET's *active* U.S. subscribers," and the screenshot indicates that the CNET Magazine Subscribers Mailing List is current "through 04/05/2021." [Dkt. No. 20, ¶ 2 (emphasis added).] But Plaintiffs do not allege that they are *active* subscribers or even that they were subscribers as of "04/05/2021." Instead, they allege that they *were*, at some point in the past, CNET subscribers. [*Id.* at ¶ 12.] There is nothing to suggest that Plaintiffs' Private Reading Information was included in the CNET Magazine Subscribers Mailing List, if that list even exists at all. *Bridges v. Senger*, 730 F. Supp. 1401, 1403 (W.D. Mich. 1990) ("Conclusory allegations are not acceptable…where [they] are contradicted by the facts themselves.").

This case, therefore, is nearly identical to *Wheaton v. Apple Inc.*, No. C 19-02883 WHA, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019), where the United States District Court for the Northern District of California dismissed a similar PPPA claim that (1) was brought by same plaintiffs' attorneys who filed this lawsuit and (2) was

based on similar screenshots. *Id.* at \*5. The plaintiffs in *Wheaton*, like Plaintiffs here, attached to their complaint a screenshot from NextMark's website, which they claimed, like Plaintiffs here claim, was evidence that the defendant had violated the PPPA. *Id.* at \*4. The court analyzed the NextMark exhibit, characterized by the plaintiffs as "a listing by a third-party data broker selling customers' names, addresses, and personal listening information," and found that the NextMark screenshot "does not provide sufficient facts to support [the plaintiffs'] argument" because "[w]ithout more information, which was surely available to counsel," the Court would not "speculate that the mail icon explicitly would lead to Apple customers' names and addresses." *Id.* at \*4.

The same is true here. For the Court to find that Plaintiffs have adequately alleged that CNET violated the PPPA, it would need to speculate on (1) whether NextMark ever had the CNET Magazine Subscribers Mailing List at all; (2) if it did, whether CNET was the entity who provided it to NextMark; (3) if CNET did, in fact, provide it to NextMark, whether CNET did so before July 30, 2016; (4) if CNET provided it to NextMark before July 30, 2016, whether it included personally identifying information; and (5) if it included personally identifying information, whether it included Plaintiffs' personally identifying information. The Court should refuse to speculate on any of these issues, let alone all five.

There can be no dispute that, in order to state a viable PPPA claim against

CNET, Plaintiffs must allege *facts* that, if accepted as true, give rise to a *plausible* inference that CNET disclosed *Plaintiffs*' Private Reading Information without their consent and *before July 30, 2016*. Plaintiffs have failed to do so. Their claims must be dismissed.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant CNET Media, Inc. requests that the Court dismiss Plaintiffs' Amended Complaint for lack of subject-matter jurisdiction or, in the alternative, for failure to state a claim.

DATED: May 16, 2022                          **BAKER & HOSTETLER LLP**

By: *s/ Matthew D. Pearson*
Casie D. Collignon
Matthew D. Pearson

BAKER HOSTETLER LLP
600 Anton Blvd., Suite 900
Costa Mesa, CA  92626
Tel.: (714) 754-6600
Facs.: (714) 754-6611
Email:mpearson@bakerlaw.com
SBN 294302

Attorneys for Defendant
CNET MEDIA, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2022, I electronically filed the foregoing

**BRIEF IN SUPPORT OF DEFENDANT CNET MEDIA, INC.'S MOTION**

**TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT** using the

CM/ECF system, which will send notification of such filing to all counsel of

record.

*/s/ Matthew D. Pearson*

4888-9129-2447.13